IN THE COURT OF APPEALS OF TENNESSEE
AT NASHVILLE
June 5, 2018 Session

# IN RE ADEN H.[1]

**Appeal from the Circuit Court for Sumner County**
**No. 2015-CV-554    Joe H. Thompson, Judge**

_____

## No. M2017-01453-COA-R3-PT

_____

The mother and step-father of a child appeal the denial of their Petition to Terminate the Parental Rights of the father of the child on the grounds of abandonment by failure to support.  Upon a thorough review of the record, we affirm the judgment of the trial court.

**Tenn. R. App. P. 3, Appeal as of Right; Judgment of the Circuit Court Affirmed**

RICHARD H. DINKINS, J., delivered the opinion of the court, in which FRANK G. CLEMENT, JR., P.J., M.S., and JOHN WESLEY MCCLARTY, J., joined.

James B. Hawkins, Gallatin, Tennessee, for the appellants, Victory M. and Natalie M.

Thomas H. Miller, Nashville, Tennessee, for the appellee, Michael H.

## OPINION

### I.    FACTS AND PROCEDURAL HISTORY

Aden H. was born to Natalie M. ("Mother") and Michael H. ("Father") in August of 2003.  At some point after Aden's birth, Victory Amos M. ("Stepfather") came to live with Mother and Father at their home.  Stepfather and Mother began a relationship that resulted in the birth of twin boys ("the Twins") in 2010.[2]  After the birth of the Twins, Mother and Father separated; in June 2010, Mother and Stepfather moved out of the house they shared with Father, taking Aden with them.

_____

[1] This Court has a policy of protecting the identity of children in parental termination cases by initializing the last names of the parties.

[2] Mother testified that DNA tests were performed that confirmed that Stepfather was the biological father of these two boys.  Further, the Final Decree of Absolute Divorce between Father and Mother recognized that Father is not the biological father of the Twins.  Neither the Twins' parentage nor the parental rights to the Twins is at issue in this appeal.

On March 25, 2014, Father went to the house Mother and Stepfather shared and vandalized the house and two cars in the driveway. Father then crashed his car, totaling it; as a result, he was arrested, charged, and convicted of driving under the influence, vandalism, and evading and resisting arrest. The next day, Mother filed a Petition for an Order of Protection, which was granted on April 1, prohibiting Father from having any contact with Mother, Aden, or the Twins and commanding that he stay at least one-mile away from Mother.[3]

Mother filed a complaint for divorce on May 21, 2014; a judgment by default granting the divorce was entered on October 3. The court incorporated a parenting plan that had been filed by Mother in the final divorce decree.

On January 9, 2015, Father filed a Petition to Modify Current/Prospective Child Support ("Petition to Modify"), in Sumner County Juvenile Court; the record does not show that the Juvenile Court took any action on this petition. On May 21, 2015, Mother and Stepfather filed a Petition ("the Petition") in Sumner County Circuit Court to (1) terminate Father's parental rights on the ground of abandonment by failure to support and (2) allow Stepfather to adopt Aden. Father answered and filed a counter-petition on June 26, requesting that the trial court either approve his proposed parenting plan or, alternatively, "establish a parenting plan that provides for the Father to have progressive reasonable and regular parenting time with the minor child." Mother and Stepfather answered the counter-petition on July 30.[4] The juvenile court case was transferred to the Sumner County Circuit Court and consolidated with the current case by order of the Circuit Court, entered February 18, 2016.

By agreed order entered October 6, 2016, the case was set to be heard on December 16; according to an order entered January 3, 2017, at the prehearing conference:

> [Father] . . . raised a threshold legal issue as to the effect and impact of possibly conflicting court orders in regard to the Petitioners' ability to go forward with their petition to terminate the parental rights of the [Father] on the grounds of abandonment for nonpayment of child support.

---

[3] The Order of Protection was to remain in effect until April 2, 2015, but allowed Mother to "ask to continue the Order," which she did on March 16, 2015; on April 15 the trial court extended the Order of Protection to May 15, 2016. On January 3, 2017, the trial court entered an order which prohibited Father from "any and all contact and communication with [Aden], pending further orders of the Court."

[4] The trial court did not rule on Father's counter-petition or the petition he originally filed in Juvenile Court before Mother and Stepfather filed the instant appeal. After the appeal was taken, they moved to remand this case for the trial court to enter an order disposing of Father's counter-petition; this Court remanded this case on October 26, 2017. Father thereafter took a voluntary non suit and the case was transferred back to this Court.

Therefore, the trial court directed each party to:

[P]repare, file, and exchange a legal brief . . . on the issue of the effect and impact of possibly conflicting court orders in regard to the Petitioners' ability to go forward with their petition to terminate the parental rights of the [Father] on the grounds of abandonment for nonpayment of child support.

After the parties submitted their briefs, the trial court entered an order on March 3, 2017, ruling as follows in regards to the ground of abandonment by failure to support:

First, by order of the Juvenile Court for Sumner County . . . [Father] was ordered to pay weekly support of $50.00 for the benefit of Aden . . . and two other minors, pending the results of a DNA test. By a subsequent order dated July 13, 2011 [Father] was disestablished as the father of [Mother's] two other children . . . . Nonetheless, the Juvenile Court modified and increased the Respondent's child support obligation to $75.00 per week for the benefit of Aden . . . . This obligation was not subsequently modified.

Second, on March 28, 2014, [Mother] filed a Petition for an Order of Protection against the [Father] in this court . . . . In her petition, [Mother] incorrectly responded to the following question on the form petition: "Other Court Cases: Are the children that you and [Father] have together involved in any other court case in Tennessee or another state?" [Mother] also checked the following box under the heading: "I ask the court to make the following Orders after the hearing: (check all that apply)."

"11. Child Support: Please order the [Father] to pay reasonable child support."

In the margin next to line 11, the [Mother] handwrote the following comment: "I have custody and he pays child support." An Order of Protection was thereafter entered by this court on April 1, 2014, but despite [Mother]'s request, no child support was ordered.

Third, on May 21, 2014, [Mother] filed for divorce against [Father]. [Father] was properly served but never made an appearance in the divorce proceedings. As a result, an Order of Default and Final Decree of Absolute Divorce was entered by this court on October 3, 2014. As part of the final divorce decree, the court adopted a permanent parenting plan that referenced the previous child support order from Sumner County Juvenile Court. The [Father] was served with a copy of the divorce decree, but notably the street address was misidentified in the certificate of service as

3

"Springfield Drive" rather than the [Father]'s actual street of residence, "Springview Drive."

Even though there are conflicting orders with respect to the [Father]'s child support obligation, those conflicting orders are not dispositive with respect to the [Father]'s obligation to support his minor child.

The trial court further ruled that "a further evidentiary hearing is required to determine if the respondent's failure to support his child was willful."[5]

That hearing was held on May 31, 2017. The trial court ruled that "the Petitioners were able to establish that [Father] was aware of his duty to support, they were not able to establish that the father had the ability to support and they were not able to prove the absence of justifiable excuse. Therefore, having failed to prove grounds for termination of [Father]'s parental rights, the best interest inquiry is pretermitted." The trial court also ordered that Mother and Stepfather were responsible for the Guardian *Ad Litem's* fees.

Mother and Stepfather raise three issues on appeal:

1. Whether, as a matter of law, the trial court erred in determining that the Appellee/Father's complete failure to support the Child did not constitute willful abandonment.

2. Whether the trial court erred in pretermitting its inquiry and failing to make findings as to whether the termination of the Appellee/Father's parental rights was in the best interests of the Child.

3. Whether the trial court erred in assigning the entirety of the Guardian *Ad Litem* fee and the court costs to the Appellants/Mother and Stepfather.

## II. STANDARD OF REVIEW

Parents have a fundamental right to the care, custody, and control of their children. *Stanley v. Illinois*, 405 U.S. 645, 651 (1972); *In re Adoption of A.M.H.*, 215 S.W.3d 793, 809 (Tenn. 2007). However, that right is not absolute and may be terminated in certain circumstances. *Santosky v. Kramer*, 455 U.S. 745, 753-54 (1982); *State Dep't of Children's Services v. C.H.K.*, 154 S.W.3d 586, 589 (Tenn. Ct. App. 2004). The statutes on termination of parental rights provide the only authority for a court to terminate a

---

[5] The Order stated that, in their brief, Petitioners conceded that abandonment by failure to visit was not a meritorious ground for termination of Father's rights; consistent with the concession, the court ruled that abandonment by failure to visit was "not available and cannot be proven" as a ground for termination of Father's parental rights

parent's rights. *Osborn v. Marr*, 127 S.W.3d 737, 739 (Tenn. 2004). Thus, parental rights may be terminated only where a statutorily defined ground exists. Tenn. Code Ann. § 36-1-113(c)(1); *Jones v. Garrett*, 92 S.W.3d 835, 838 (Tenn. 2002); *In re M.W.A.*, 980 S.W.2d 620, 622 (Tenn. Ct. App. 1998). To support the termination of parental rights, only one ground need be proved, so long as it is proved by clear and convincing evidence. *In the Matter of D.L.B.*, 118 S.W.3d 360, 367 (Tenn. 2003).

Because the decision to terminate parental rights affects fundamental constitutional rights and carries grave consequences, courts must apply a higher standard of proof when adjudicating termination cases. *Santosky*, 455 U.S. at 766–69. A court may terminate a person's parental rights only if (1) the existence of at least one statutory ground is proved by clear and convincing evidence and (2) it is shown, also by clear and convincing evidence that termination of the parent's rights is in the best interest of the child. Tenn. Code Ann. § 36-1-113(c); *In re Adoption of A.M.H.*, 215 S.W.3d at 808–09; *In re Valentine*, 79 S.W.3d 539, 546 (Tenn. 2002). In light of the heightened standard of proof in these cases, a reviewing court must adapt the customary standard of review set forth by Tenn. R. App. P. 13(d). *In re M.J.B.*, 140 S.W.3d 643, 654 (Tenn. Ct. App. 2004). As to the court's findings of fact, our review is *de novo* with a presumption of correctness unless the evidence preponderates otherwise, in accordance with Tenn. R. App. P. 13(d). *Id.* We must then determine whether the facts, "as found by the trial court or as supported by the preponderance of the evidence, clearly and convincingly establish the elements" necessary to terminate parental rights. *Id.* In this regard, clear and convincing evidence is "evidence in which there is no serious or substantial doubt about the correctness of the conclusions drawn from the evidence" and which "produces a firm belief or conviction in the fact-finder's mind regarding the truth of the facts sought to be established." *In re Alysia S.,* 460 S.W.3d 536, 572 (Tenn. Ct. App. 2014) (internal citations omitted).

### III. ANALYSIS

#### A. Abandonment by failure to support

Abandonment is identified as a ground for termination in Tennessee Code Annotated section 36-1-116(g)(1) and defined at section 36-1-102(1)(A), which reads in pertinent part:

> For a period of four (4) consecutive months immediately preceding the filing of a proceeding or pleading to terminate the parental rights of the parent or parents or the guardian or guardians of the child who is the subject of the petition for termination of parental rights or adoption, that the parent or parents or the guardian or guardians either have willfully failed to . . . support or have willfully failed to make reasonable payments toward the support of the child[.]

A failure to provide support is not sufficient, on its own, to establish abandonment; that failure to support must also be willful. *In re Audrey*, 182 S.W.3d 838, 864 (Tenn. Ct. App. 2005). A failure to support is "'willful' when a person [1] is aware of his or her duty to visit or support, [2] has the capacity to do so, [3] makes no attempt to do so, and [4] has no justifiable excuse for not doing so." *In re Audrey*, 182 S.W.3d at 864.[6]

The trial court concluded that Petitioners "were able to establish that [Father] was aware of his duty to support" and that Father did not pay any support during the relevant time period, the four months before the Petition was filed, January 21 through May 21, 2015, but Petitioners "were not able to establish that the father had the ability to support and they were not able to prove the absence of justifiable excuse." Petitioners argue that "the record before the trial court, taken in its entirety, shows and establishes that the Father's failure to support the Aden was 'willful,' as the Father was well aware of his duty to support, had the capacity to do so, made no attempt to do so, and had no justifiable excuse for not doing so." Father argues that there was "a sparsity of proof regarding Father's income and expenses during the relevant four-month period," and the trial court correctly found that there was not clear and convincing evidence that Father willfully failed to support Aden.

Father stipulated at trial that he did not pay child support in the four consecutive months immediately prior to the filing of the Petition; his testimony provided the majority of evidence of willfulness. He testified that, in the aftermath of his arrest in March 2014, he lost his driver's license privileges, his job, and his house, and he was forced to live with his mother for approximately six months after his release from custody in April 2014. He further testified that he had to depend on others to get to and from his jobs due to his lack of a driver's license. On direct and cross examinations, Father described his employment during 2014 and 2015:

---

[6] Further, this Court has recognized:

> Willfulness of a parent's conduct depends on the parent's intent, and intent is seldom capable of direct proof. *In re Audrey S.*, 182 S.W.3d at 864 (citing *In re Adoption of S.M.F.*, No. M2004-00876-COA-R9-PT, 2004 WL 2804892, at *8 (Tenn. Ct. App. Dec. 6, 2004)). Triers-of-fact lack the ability to peer into a person's mind to assess intentions or motivations and must infer intent from circumstantial evidence, including the parent's actions or conduct. *Id*. Because testimony may be critical to the determination of whether a parent's conduct was willful, trial courts are best situated to make a determination of willfulness. *In re D.L.B.*, 118 S.W.3d at 367. The question of intent or willfulness depends on the totality of the circumstances, and the facts must be applied to the standard definition of willfulness. *V.D. v. N.M.B.*, No. M2003-00186-COA-R3-CV, 2004 WL 1732323, at *6 (Tenn. Ct. App. July 26, 2004).

*In re Alysia S.*, 460 S.W.3d at 566.

Q. So you were released in April of 2014; is that right?
A. Yes, sir.
Q. And did you work up until what was your work experience like from then until, say, September of the next year?
A. Very sporadic. I was working with a local union. We set up, like, trade shows and concerts and stuff, like, down at Bridgestone. But it was never a steady job. You know, you were basically on call. They would call one morning and say, "Hey, are you available to work the next day?" "Yes." And I'd work maybe three to five days straight and then probably wouldn't work two to three weeks.
Q. And did you have to have someone to help you with your transportation to get to work?
A. Oh, yeah. I didn't have any means whatsoever other than friends and family.
Q. Did you have a vehicle?
A. No.
Q. And you didn't have a license, obviously.
A. No.
Q. Did you lose your home?
A. Yeah.
Q. What happened as far as you losing your home?
A. From lack of employment, I got behind on the mortgage payment and just was unable to catch it up before they started foreclosure proceedings.
Q. Did you make child support payments during this period of time as best you could?
A.  When I could. I tried.
. . .
Q. So you were working sporadically from April of 2014, I think your testimony was, until September of 2015.
A. Right.
Q.  And the Exhibit 3, which is the payment history, shows that your payments were not consistent during that period of time.
A. Yes, sir.
Q. You've looked at that.
A. Yes, sir.
. . .
Q. I'm just asking were you able to pay and just willfully did not.
A.  No, sir.

Father also testified about garnishment notices issued to his employers:

Q. And yet you were getting notices from the child support office sent to your employers, weren't you?

7

A. Yes, sir.

Q. And those notices were for garnishment of your paychecks, weren't they?

A. Yes, sir.

Q. And when those garnishment notices were received in 2014, you changed employment, didn't you?

A. When I was working for the union --

Q. Yes, sir.

A. – there's multiple employers. And depending on what production you're setting up, you work for a different company. So some companies would set up the garnishment, but I would only work for them for a week or two and then I may work for another company.

Q. Did you, out of care and concern for your son's well-being, alert your employers that you had a child support obligation?

A. Yes, sir.

Q. And then whose responsibility was it to send in those child support payments?

A. For the companies that did the garnishment, they automatically took it. The other ones, like I said, it was very sporadic employment because of different companies. So if I had set something up one week, I probably wouldn't be working for the same company the next week.

Q. Okay. In 2014 you worked for several employers, didn't you?

A. Uh-huh.

Q. In 2015 you worked for several employers, didn't you?

A. Yes, sir.

In addition to his testimony, the Petition to Modify that Father had filed in the Juvenile Court was entered as an exhibit; in that petition Father related that he was unemployed, but was actively seeking employment.

The trial court made several findings of fact relevant to Father's capacity to meet his support obligation:

3. [Father] was arrested for various charges, including driving under the influence which resulted in the loss of his license, his job, his home, and his truck. He also spent a month in jail until April 23, 2015.

4. [Father]'s work was sporadic after his arrest due to the fact that he had lost his transportation, didn't have a license, and had to rely on other individuals to transport him to his job.

5. Despite the conflicting orders from the juvenile court, the divorce court, and the Order of Protection, [Father] was aware of his duty to pay child

8

support, as evidenced by his own testimony and by his petition to reduce his child support which he filed on January 9, 2015.

6. [Father]'s statements in his petition to modify his child support are consistent with his testimony about his difficulty in finding work.

7. The Petitioners offered no proof to contradict this testimony such as tax returns, 1099's, W-2s, or other proof of income that would have been readily available in discovery.

The evidence shows that Father's employment was sporadic and inconsistent, and that he worked for multiple employers, usually no longer than a week or two at a time; this testimony was uncontradicted. There is no evidence of the dates of his employment and the record shows that on January 9, 2015, a couple of weeks before the relevant four month period began on January 21, Father filed a petition to modify his child support in which he claimed he was completely unemployed. The evidence presented supports the trial court's findings, and Mother and Stepfather have cited no evidence that preponderates against those findings.

Our Supreme Court has recognized "the significance of evidence concerning a parent's income and expenses when the ground of abandonment by willful failure to support is alleged." *In re Navada N.*, 498 S.W.3d 579, 594 (Tenn. Ct. App. 2016) (citing *In re Adoption of Angela E.*, 402 S.W.3d 636, 641 (Tenn. 2013)). This Court has gone so far as to say that "without [evidence regarding a parent's income, ability to work, or expenses], a finding of willfulness cannot be sustained.'" *In re Addison B.*, No. E2016-00966-COA-R3-PT, 2016 WL 6996372, at *4 (Tenn. Ct. App. Nov. 30, 2016) (citing *In re Navada N.*, 2016 WL 3090908 at *15)). There is no evidence of Father's income or expenses.

In reliance on *In re Casey C.*, Mother and Stepfather contend that Father's testimony that he drank alcohol regularly during 2014 and 2015, purchasing beer or tequila one or two days every week during that period but tapering off in 2015, is evidence of Father's ability to pay support. No. M2016-01344-COA-R3-PT, 2016 WL 7340429 (Tenn. Ct. App. Dec. 19, 2016), appeal denied (Jan. 25, 2017). In that case, the trial court terminated a Mother's parental rights after finding that the mother

consistently tested positive for cocaine, that despite having provided only token support for her children, she smokes by her admission, some ten cigarettes [per day] and if she had provided support that the cigarettes and her cocaine cost, that would get her out of this problem of having failed to support her children. [Mother] has chosen to indulge her own habits and addiction at the expense of her relationship with her children and at the expense of her children being supported by a parent.

9

*Id.* On appeal, this Court affirmed the trial court, concluding that "Mother is able to get money for her cigarette and cocaine habits, but is unconcerned with providing any meaningful support for the Children" and that the evidence "clearly and convincingly establish[ed] the elements necessary to terminate Appellant's parental rights on the ground of abandonment by willful failure to support." *Id.* at *7.

In contrast to the parent in *In re Casey C*, the evidence here shows Father was capable of and pursued employment, when it was available and he was able to arrange for transportation. The trial court here did not find that "[Father] has chosen to indulge [his] own habits and addiction" at the expense of his relationship with Aden. The evidence shows that Father knew of his duty to support; that he sought a modification of his support due to his inability to pay; and that he was unable to pay for a period of time as a result of a criminal episode. Taken as a whole and in context, the proof is not clear and convincing that Father willfully failed to provide support within the meaning of Tennessee Code Annotated section 36-1-116(g)(1).[7]

## B.    Guardian *Ad Litem* Fees

Tennessee Rules of Civil Procedure 17.03 authorizes the trial court, in its discretion, to award a guardian *ad litem* a reasonable fee for services rendered; that fee is "to be taxed as costs." *Brown v. Brown*, No. 02A01-9709-CV-00228, 1998 WL 760935, at *9 (Tenn. Ct. App. Nov. 2, 1998). We do not reverse a trial court's award of guardian *ad litem* fees unless an abuse of discretion is shown. *Kahn v. Kahn*, No. W2003-02611-COA-R3CV, 2005 WL 1356449, at *5 (Tenn. Ct. App. June 6, 2005). An abuse of discretion occurs if a trial court causes an injustice to a party by "(1) applying an incorrect legal standard, (2) reaching an illogical or unreasonable decision, or (3) basing its decision on a clearly erroneous assessment of the evidence." *Lee Med., Inc. v. Beecher*, 312 S.W.3d 515, 524 (Tenn. 2010).

Petitioners do not argue that the amount of the fee was not reasonable or that the services rendered were not appropriate; they argue that the trial court erred by taxing them with the whole of the guardian *ad litem's* fee because "the majority of the time and efforts devoted by the Guardian *Ad Litem* was directed toward, and thus attributable to, the Father, and his relatives." On the record presented, we do not find that the court abused its discretion in taxing the Guardian *Ad Litem's* fee to Mother and Stepfather.

While Mother and Stepfather complain that the majority of the time was spent "directed toward . . . Father and his relatives," they do not explain the significance of this fact and how it militates against the taxation of this cost to them. The record shows that

---

[7] In light of our holding in this regard, Mother and Stepfather's argument that the trial court erred by pretermitting the best interest analysis is pretermitted.

the Guardian *Ad Litem* was appointed on April 20, 2016, after the juvenile court case had been transferred and consolidated with the proceeding to terminate Father's parental rights to Aden and for Stepfather to adopt him. In the guardian's first affidavit, reporting time spent through the date of first trial setting of December 16, 2016, he reported expending 13.8 hours; in his second affidavit, cumulative to the first, he reported an additional 5.9 hours, including time spent at the trial. There is nothing in the record to indicate that the time spent or work performed were not appropriate, given the nature of the proceeding. The trial court acted within its discretion when it taxed the costs, and we discern no abuse of discretion in that regard.

### C. Attorney's Fees on Appeal

Both parties request their attorney's fees for this appeal. As this Court has stated:

> [I]t is in the sole discretion of this court whether to award attorney's fees on appeal. As such, when this Court considers whether to award attorney's fees on appeal, we must be mindful of the ability of the requesting party to pay the accrued fees, the requesting party's success in the appeal, whether the requesting party sought the appeal in good faith, and any other equitable factor that need be considered.

*Spigner v. Spigner*, No. E2013-02696-COA-R3CV, 2014 WL 6882280, at *13 (Tenn. Ct. App. Dec. 8, 2014) (citations omitted). Considering the circumstances of this case, in our discretion we decline to award fees to either party.

### IV. CONCLUSION

For the foregoing reasons, we affirm the judgment of the trial court in all respects.

_____
RICHARD H. DINKINS, JUDGE